# EXHIBIT A

Filing # 239900944 E-Filed 01/20/2026 05:38:46 PM

## IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
## IN AND FOR ORANGE COUNTY FLORIDA

JOHN NICHOLS ON BEHALF
OF THE NICHOLS FAMILY TRUST,
NU VIEW TRUST CO.,
 and JOHN EDWIN NICHOLS ROTH IRA;
LAWRENCE J. SZROM,
individually,
PRASAD KANDULA ON BEHALF OF ;
PEACOCK LIMITED PARTNERSHIP;
ELLIOT GRODKO, individually,
RYAN AND JAMIE SMITH,
INDIVIDUALLY AND AS
AUTHORIZED REPRESENTATIVES OF
MHPI V, LLC; JR SMITH HOLDINGS
LLLP; AND ELEVATION EMPLOYEES, LLC
and on behalf of all others similarly situated,

       Plaintiffs,

v.

KMD INVESTMENTS I, LP,
KMD INVESTMENTS III, LP,
KMD INVESTMENTS V, LP,
KMD SEGREGATED PORTFOLIO, SPC
DAHN CORPORATION,
NANCY NAEVE,
DAVID JORGENSEN, and
BRIAN DAHN,

       Defendants, and

MHPI VII, LLC,
ELEVATION FUND 8, LLC,
ELEVATION VERO BEACH SA, LLC,
MHPI VII MANAGER, LLC,
ELEVATION FUND 8 MANAGER, LLC,
and VERO BEACH MANAGER, LLC,

       Nominal Defendants.
_____/

Case No. _____

**CLASS REPRESENTATION**

**COMPLAINT AND DEMAND FOR JURY TRIAL**

The Plaintiffs, Ryan and Jamie Smith, individually and as authorized representatives of MPHI V, LLC, JR Smith Holdings LLLP, and Elevation Employees, LLC, Prasad Kandula on behalf of Peacock Limited Partnership, John Nichols on behalf of the Nichols Family Trust, NU View Trust C. and John Edwin Nichols Roth IRA, Elliot Grodko, and Lawrence J. Szrom, individually, and on behalf of all others similarly situated, hereby sue the Defendants, KMD Investments I, LP ("KMD I"), KMD Investments III, LP ("KMD III"), KMD Investments V, LP ("KMD V"), Dahn Corporation, Nancy Naeve, David Jorgensen, and Brian Dahn, and the Nominal Defendants, MHPI VII, LLC ("Fund 7"), Elevation Fund 8, LLC ("Fund 8"), Elevation Vero Beach SA, LLC ("Vero Beach Fund"), MHPI VII Manager, LLC ("Fund 7 Manager"), Elevation Fund 8 Manager, LLC ("Fund 8 Manager"), and Vero Beach Manager, LLC ("Vero Beach Manager"). For their Complaint, the Plaintiffs allege:

**INTRODUCTION AND NATURE OF THE CASE**

1.      This is an action for securities fraud arising from Defendant Brian Dahn's (and his affiliated entities') long-running scheme to misappropriate corporate opportunities from, and divert revenues and profits from, three investment funds that Dahn was entrusted to co-manage. As alleged below, through Dahn's long-running fraudulent scheme—which the Plaintiffs only recently discovered, and which remains rampant—Dahn has effectively embezzled approximately $5.5 million from the funds to date.

2.      Dahn is a self-described expert in the self-storage industry, with approximately 40 years of experience in managing self-storage facilities and related businesses. Based on his industry expertise, in 2017, Dahn induced Jamie and Ryan Smith ("the Smiths")—the owners of non-party Elevation Capital Group, LLC, an investment firm—to sponsor investment funds, which

2

would own and operate self-storage facilities and manufactured housing communities ("MHCs") across the United States (including in Florida). As a result of this venture, and to effectuate it, Dahn and the Smiths agreed that, through their entities, they would serve as equal co-managers of each investment fund. The Smiths also agreed to solicit future investors on behalf of the Funds as part of the Smiths' co-managerial responsibilities. In addition, the Smiths personally, and through corporate entities which they personally control, are investors in the Funds.

3.      This lawsuit relates to Dahn's scheme to defraud investors in three specific investment funds—MHPI VII, LLC ("Fund 7"), Elevation Fund 8, LLC ("Fund 8"), and Elevation Vero Beach SA, LLC ("Vero Beach Fund") (collectively, the "Funds")—of the Funds' entitlement to valuable insurance payments (including monthly premium payments) from tenants at the self-storage facilities that the Funds own and operate.

4.      Dahn (and his affiliated entities) participated in the marketing, promotion, and sale of membership interests in the Funds, ultimately helping to raise over $45 million from over 250 investors in Florida alone.

5.      As described in more detail below, in connection with his marketing, promotion, and sale of membership interests in the Funds, Dahn provided investors with, and ultimately agreed to, certain Investment Documents—*i.e.*, Private Placement Memoranda, Operating Agreements, and Subscription Agreements. Through those Investment Documents, Dahn agreed to be bound by the fiduciary duties of loyalty, care, and good faith in connection with his role as the Funds' co-Manager; represented that the Funds would seek to generate, and in turn distribute to their members, all revenues attendant to the Funds' ownership of the properties; and represented that he would avoid conflicts of interest and self-dealing. Further, in connection with his sponsorship of the Funds, Dahn provided the Smiths (in their capacities as the Funds' co-Manager and as investors

3

in the Funds) Offering Memoranda, which summarized the major features of the self-storage facilities that the Funds would acquire, including location and property information, details about acquisition costs, and, as most relevant here, financial data and other information regarding the facilities' historical and projected income and expenses. These Offering Memoranda explicitly represented that tenant insurance payments (including monthly premium payments), to the extent received or collected, were, and would be, a component of each self-storage facility's (and, thus, of each Fund's) income.

6.      In reality, Dahn's representations to investors in the Investment Documents, and his representations in the Offering Memoranda, were knowingly false. In this connection, in January 2025, the Smiths discovered that Dahn has been engaged in a scheme to misappropriate and divert tenant insurance payments from the Funds. Specifically, and contrary to Dahn's representations that the Funds would seek to generate and distribute all revenues attendant to the Funds' ownership of the properties, Dahn organized a captive insurance company to sell insurance programs to, and collect insurance premiums from, tenants at the Funds' self-storage facilities (the "Insurance Premium Scheme"). The materials that the Smiths recently discovered indicate that Dahn's affiliated insurance company has improperly collected—indeed, effectively embezzled from the Funds—at least *$5,586,069.84* in insurance premiums (the "Improper Premiums"). Per the Investment Documents, the net proceeds derived from the Improper Premiums should have been distributed to investors in the Funds. They were not, and were instead retained by Dahn in an illicit and undisclosed personal enrichment scheme.

7.      Dahn has never disclosed the Insurance Premium Scheme, or his receipt of the Improper Premiums, to investors, either in connection with the investors' purchase of membership interests in the Funds, or at any point after the investors had acquired their interests. Indeed, as

4

noted, the existence of the Insurance Premium Scheme directly contradicts Dahn's representations to investors during the offering process, including with respect to the Investment Documents and the Offering Memoranda, which represented that revenues attendant to the Funds' ownership of the properties belonged to the Funds—and the Funds alone. Moreover, during the period in which Dahn has perpetrated the Insurance Premium Scheme, Dahn has concealed the scheme, including by intentionally omitting the scheme from periodic updates to Fund investors and from several other agreements that Dahn has executed or generated in connection with his co-management of the Funds, and by failing to disclose the scheme to the Funds' co-managers, counsel, and independent auditors.

8.    Accordingly, in this action, the Plaintiffs assert claims against Dahn and his affiliated entities for violation of the anti-fraud provisions of the California Corporations Code, §25401 et seq.; for violation of the anti-fraud provisions of Florida's Blue Sky Law, § 517.301, Fla. Stat.; for common law fraud; for negligent misrepresentation; and for breach of contract. The Plaintiffs seek rescission of their investments; damages; injunctive relief to stop Dahn's perpetration of the Insurance Premium Scheme; to remove him as co-Manager of the Funds; and any other relief that the Court considers proper.

**THE PARTIES, JURISDICTION, AND VENUE**

*The Plaintiffs*

9.    The Plaintiffs are both Florida-based and non-Florida-based investors in, and members of, the Funds.

10.    Plaintiffs Ryan Smith and Jamie Smith are residents of Orange County, Florida. Collectively, they own and operate MHPI V, LLC, JR Smith Holdings LLLP and Elevation Employees, LLC. The Smiths, via MHPI V, LLC, JR Smith Holdings LLLP and Elevation

5

Employees, LLC invested $2,900,000 in Fund 7, $90,000 in Fund 8, and $100,000 in the Vero Beach Fund to purchase membership interests in each Fund. Plaintiffs, Ryan and Jamie Smith, and the respective controlled entities, are currently members of Fund 7, Fund 8, and the Vero Beach Fund.

11.     Plaintiff MHPI V, LLC is a limited liability company incorporated under the laws of the State of Florida. MHPI V invested a total of $2,700,000 to purchase membership interests in Fund 7. Plaintiff MHPI V is currently a member of Fund 7.

12.     Plaintiff JR Smith Holdings, LLLP is a limited liability limited partnership incorporated under the laws of the State of Florida. JR Smith Holdings invested $100,000 in Fund 7, $80,000 in Fund 8, and $100,000 in the Vero Beach Fund to purchase membership interests in each Fund. Plaintiff JR Smith Holdings is currently a member of Fund 7, Fund 8, and the Vero Beach Fund.

13.     Plaintiff Elevation Employees, LLC is a limited liability company incorporated under the laws of the State of Florida. Elevation Employees invested $100,000 in Fund 7 and $10,000 in Fund 8 to purchase membership interests in Fund 7 and Fund 8. Plaintiff Elevation Employees is currently a member of Fund 7 and Fund 8.

14.     Plaintiff Prasad Kandula is a resident of St. Clair County, Illinois. He is the owner and principal of Peacock Limited Partnership, a limited partnership formed under the laws of the State of Illinois. Kandula, via Peacock Limited Partnership, invested $3,500,000 in Fund 7, $3,500,000 in Fund 8, and $500,000 in the Vero Beach Fund to purchase membership interests in each Fund. Plaintiff Peacock Limited Partnership is currently a member of Fund 7, Fund 8, and the Vero Beach Fund.

15.     Plaintiff John Nichols is a resident of Sumter County, Florida. Plaintiffs John E Nichols invested $330,000 in Fund 7 and $380,000 in Fund 8, including investments made via entities Nu View Trust Co., John Edwin Nichols Roth IRA, and Nichols Family Trust (a trust established under the laws of the State of Florida).  Plaintiffs Nichols and his entities are currently members of Fund 7 and Fund 8.

16.     Plaintiff Elliott Grodko is a resident of New Jersey. Plaintiff Grodko invested $50,000 in Fund 7 and $60,000 in Fund 8 to purchase membership interests in Fund 7 and Fund 8. Plaintiff Grodko is currently a member of Fund 7 and Fund 8.

17.     Plaintiff Lawrence J. Szrom is a resident of Orange County, California. Plaintiff Szrom invested a total of $460,353 to purchase membership interests in Fund 7 and Fund 8. Plaintiff Szrom is currently a member of Fund 7 and Fund 8.

### The Fund 7 Defendants

18.     Nominal Defendant MHPI VII, LLC ("Fund 7") is a Delaware limited liability company that performs significant business functions in Orange County, Florida. Fund 7 is a manager-managed limited liability company. As discussed further below, in connection with their purchase of membership interests in Fund 7, Plaintiffs Ryan and Jamie Smith, individually and as authorized representatives of MPHI V, LLC, JR Smith Holdings LLLP, and Elevation Employees, LLC; Prasad Kandula on behalf of Peacock Limited Partnership; John Nichols on behalf of the Nichols Family Trust, Nu View Trust Co., John Edwin Nichols Roth IRA; Elliot Grodko; and Lawrence J. Szrom agreed to the Limited Liability Company Agreement of MHPI VII, LLC, dated April 5, 2017 (the "Fund 7 Operating Agreement"). Through special purpose vehicles owned by Fund 7, Fund 7 owns and operates self-storage facilities and MHCs across the United States, including one self-storage facility in Florida, and two additional facilities elsewhere in Florida.

7

19.    Nominal Defendant MHPI VII Manager, LLC ("Fund 7 Manager") is a Delaware limited liability company with its principal place of business in Orange County, Florida. Under the Fund 7 Operating Agreement and applicable law, Fund 7 Manager manages Fund 7.

20.    Fund 7 Manager is made up of two member-managers, which own equal 50% interests in Fund 7 Manager: Defendant KMD Investments I, LP ("KMD I") and non-party MHPI VII Management, LLC (which is ultimately owned by Jamie and Ryan Smith). As a result of Fund 7 Manager's ownership and management structure, Dahn (through KMD I) and the Smiths (through MHPI VII Management, LLC) co-manage Fund 7.

21.    Defendant KMD I is a California limited partnership with its principal place of business in Orange County, California. KMD I's sole general partner, Defendant Dahn Corporation, is a California corporation with its principal place of business in Orange County, California. In turn, Defendant Brian Dahn is Dahn Corporation's president and, upon information and belief, its sole shareholder. Defendants Nancy Naeve and David Jorgensen are senior executives of Dahn Corporation.

***The Fund 8 Defendants***

22.    Nominal Defendant Elevation Fund 8, LLC ("Fund 8") is a Delaware limited liability company that performs significant business functions in Orange County, Florida. Fund 8 is a manager-managed limited liability company. In connection with their purchase of membership interests in Fund 8, Plaintiffs Ryan and Jamie Smith, individually and as authorized representatives of MPHI V, LLC, JR Smith Holdings LLLP, and Elevation Employees, LLC, Prasad Kandula on behalf of Peacock Limited Partnership, John Nichols on behalf of the Nichols Family Trust [AND OTHERS?], Elliot Grodko, and Lawrence J. Szrom agreed to the Limited Liability Company Agreement of Elevation Fund 8, LLC, dated July 29, 2020 (the "Fund 8 Operating Agreement").

Through special purpose vehicles owned by the Fund 8, Fund 8 owns and operates self-storage facilities and MHCs across the United States, including one self-storage facility in Florida.

23.     Nominal Defendant Elevation Fund 8 Manager, LLC ("Fund 8 Manager") is a Delaware limited liability company with its principal place of business in Orange County, California. Under the Fund 8 Operating Agreement and applicable law, Fund 8 Manager manages Fund 8.

24.     Fund 8 Manager is made up of two member-managers, which own equal 50% interests in Fund 8 Manager: Defendant KMD Investments III, LP ("KMD III") and non-party Elevation Fund 8 Management, LLC (which is ultimately owned by the Smiths). As a result of Fund 8 Manager's ownership and management structure, Dahn (through KMD III) and the Smiths (through Elevation Fund 8 Management, LLC) co-manage Fund 8.

25.     Defendant KMD III is a California limited partnership with its principal place of business in Orange County, California. KMD III's sole general partner, Defendant Dahn Corporation, is a California corporation with its principal place of business in Orange County, California. In turn, Defendant Brian Dahn is Dahn Corporation's president and, upon information and belief, its sole shareholder. Defendants Nancy Naeve and David Jorgensen are senior executives of Dahn Corporation.

***The Vero Beach Fund Defendants***

26.     Nominal Defendant Elevation Vero Beach SA, LLC ("Vero Beach Fund") is a Delaware limited liability company with its principal place of business in Orange County, California. Vero Beach Fund is a manager-managed limited liability company. In connection with their purchase of membership interests in Vero Beach Fund, Plaintiffs Ryan and Jamie Smith, individually and as authorized representatives JR Smith Holdings LLLP and Prasad Kandula on

9

behalf of Peacock Limited Partnership agreed to the Limited Liability Company Agreement of Elevation Vero Beach SA, LLC, dated May 22, 2023 (the "Vero Beach Fund Operating Agreement"). Vero Beach Fund directly owns and operates a self-storage facility in Indian River County, Florida.

27.    Nominal Defendant Vero Beach Manager, LLC ("Vero Beach Manager") is a Delaware limited liability company with its principal place of business in Orange County, California. Under the Vero Beach Fund Operating Agreement and applicable law, Vero Beach Manager manages Vero Beach Fund.

28.    Vero Beach Manager is made up of two member-managers, which own equal 50% interests in Vero Beach Manager: Defendant KMD Investments V, LP ("KMD V") and non-party Vero Beach Management, LLC (which is ultimately owned by the Smiths). As a result of Vero Beach Manager's ownership and management structure, Dahn (through KMD V) and the Smiths (through Vero Beach Management, LLC) co-manage Vero Beach Fund.

29.    Defendant KMD V is a California limited partnership with its principal place of business in Orange County, California. KMD V's sole general partner, Defendant Dahn Corporation, is a California corporation with its principal place of business in Orange County, California. In turn, Defendant Brian Dahn is Dahn Corporation's president and, upon information and belief, its sole shareholder. Defendants Nancy Naeve and David Jorgensen are senior executives of Dahn Corporation.

30.    Defendant KMD Segregated Portfolio, SPC is a segregated portfolio company established under the laws of the Cayman Islands. KMD Segregated Portfolio, SPC's sole general owner is Brian Dahn. Upon information and belief, Brian Dahn is the sole shareholder in KMD Segregated Portfolio, SPC.

*Brian Dahn*

31.    Defendant Brian Dahn is a citizen of California.

32.    For the purposes of the securities fraud claims alleged in this complaint, Dahn is a "control person" of each of KMD I, KMD III, KMD V, and Dahn Corporation. Specifically, as the sole general partner (through Dahn Corporation) and ultimate owner of KMD I, KMD III, KMD V, and KMD Segregated Portfolio, SPC, and as the president and sole shareholder of Dahn Corporation, Dahn controls the business and affairs of each of these entities, including by directly or indirectly influencing these entities' policies and decision-making processes. Accordingly, in addition to having primary liability for the securities fraud claims alleged below (and in addition to the primary liability attributable to KMD I, KMD III, KMD V, KMD Segregated Portfolio, SPC, and Dahn Corporation), Dahn has "control person" liability with respect to KMD I's, KMD III's, KMD V's, KMD Segregated Portfolio, SPC, and Dahn Corporation's securities violations.

33.    Unless otherwise indicated (or unless the context of an allegation suggests otherwise), references in this complaint to the term "Dahn" include each of Dahn (individually), KMD I, KMD III, KMD V, and Dahn Corporation.

*Nancy Naeve*

34.    Defendant Nancy Naeve is a citizen of California.

35.    For the purposes of the securities fraud claims alleged in this complaint, Naeve is a "control person" of each of KMD I, KMD III, KMD V, and Dahn Corporation. Specifically, as the Senior Vice President of Dahn Corporation, Naeve controls the business and affairs of each of these entities, including by directly or indirectly influencing these entities' policies and decision-making processes. Accordingly, in addition to having primary liability for the securities fraud

11

claims alleged below (and in addition to the primary liability attributable to KMD I, KMD III, KMD V, and Dahn Corporation), Naeve has "control person" liability with respect to KMD I's, KMD III's, KMD V's, and Dahn Corporation's securities violations.

***David Jorgensen***

36.    Defendant David Jorgensen is a citizen of California.

37.    For the purposes of the securities fraud claims alleged in this complaint, Jorgensen is a "control person" of each of KMD I, KMD III, KMD V, and Dahn Corporation. Specifically, as the Controller of Dahn Corporation, Jorgensen controls the business and affairs of each of these entities, including by directly or indirectly influencing these entities' policies and decision-making processes. Accordingly, in addition to having primary liability for the securities fraud claims alleged below (and in addition to the primary liability attributable to KMD I, KMD III, KMD V, and Dahn Corporation), Jorgensen has "control person" liability with respect to KMD I's, KMD III's, KMD V's, and Dahn Corporation's securities violations.

***Jurisdictional and Venue Allegations***

38.    The Court has specific personal jurisdiction over the Defendants under Florida's Long-Arm Statute, § 48.193(1)(a)2., Fla. Stat., because the Defendants made the relevant misrepresentations and omissions (described further below) to the Plaintiffs in Florida (or otherwise directed their tortious conduct and communications to the Plaintiffs in Florida), and because the Plaintiffs suffered injury in Florida. Further, the Court has specific personal jurisdiction over the Defendants under § 48.193(1)(a)1., Fla. Stat. because the Plaintiffs' claims arise from the Defendants' operation of a business in this state for monetary benefit—namely, the Defendants' marketing, promotion, and sale of membership interests in the Funds, including to the Florida-based Plaintiffs. Finally, the Court has specific personal jurisdiction over the Defendants

12

under § 48.193(1)(a)7., Fla. Stat. because, with respect to the Plaintiffs' contract-based claims, the Defendants breached the Investment Documents (discussed further below) by failing to perform acts required to be performed in Florida. The Court may properly exercise personal jurisdiction over the Defendants, consistent with constitutional considerations, because the Defendants purposefully directed their activities to Florida, and because they purposefully availed themselves of the benefits of conducting business in Florida. Based on these contacts, the Court's exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice.

39.    Venue is appropriate in this Court because a substantial portion of the events giving rise to this lawsuit occurred in this County.

40.    All conditions precedent to the filing of this lawsuit have occurred, have been waived, or have otherwise been satisfied.

<b><u>GENERAL ALLEGATIONS</u></b>

**A. <u>Dahn and Elevation Agree to Sponsor the Funds to Operate Self-Storage Businesses</u>**

41.    Non-party Elevation Capital Group, LLC ("Elevation") is an Orlando, Florida-based investment and private equity firm specializing in alternative real estate investments. Founded in 2013 by Jamie and Ryan Smith, to date, Elevation has sponsored numerous investment vehicles and projects, representing an aggregate acquisition value of over $500 million, and encompassing over 175 self-storage facilities and MHCs in more than 20 states.

42.    Dahn is a self-described expert in the self-storage industry, with approximately 40 years of experience in managing self-storage facilities and related businesses, and in sponsoring investment vehicles focused on acquiring, owning, and operating self-storage facilities.

43.    Based on Dahn's industry expertise, in 2017, Dahn induced Elevation and the Smiths to organize, sponsor, and manage certain investment funds to solicit investor capital and,

13

in turn, to use that capital to acquire and operate self-storage facilities and MHCs across the United States. As a result of this venture, and to effectuate it, Dahn and the Smiths agreed that they would serve as equal co-managers of the investment funds (each of which is structured as a manager-managed limited liability company). As noted above, with respect to the three Funds at issue here (Fund 7, Fund 8, and Vero Beach Fund), which are respectively managed by Fund 7 Manager, Fund 8 Manager, and Vero Beach Manager, Dahn co-managed the Funds through his vehicles (KMD I, KMD III, and KMD V), and the Smiths co-managed the Funds through their vehicles.

44.    As is customary with investment vehicles such as the Funds, the Funds' Investment Documents provide for the payment of certain periodic fees to the Funds' Managers, including asset management and acquisition fees, which are based on the Funds' asset value or on the value of the Funds' new property acquisitions, respectively. Given the Managers' equal ownership and management structure (as described in detail above), these periodic fees would effectively be shared between Dahn and the Smiths, in their capacities as co-Managers of the Funds.

45.    Crucially, however, the Investment Documents also provide for the payment of certain additional fees to Dahn or his affiliates (including Dahn Corporation) for their sole and exclusive benefit, including a Property Management Fee, ostensibly for Dahn's day-to-day management of the self-storage facilities and MHCs that the Funds would acquire. The Plaintiffs agreed to the Funds' payment of these additional fees to Dahn based on his purportedly extensive experience in managing and overseeing self-storage facilities. Accordingly, in his capacity as co-Manager and as the Funds' property manager under the terms of certain Property Management Agreements (addressed below), at all relevant times, Dahn had significant control over the Funds' assets, including exclusive control over the day-to-day management of the Funds' properties.

14

**B. Dahn Fraudulently Induces the Plaintiffs Into Investing in the Funds, by Making Affirmative Misrepresentations About the Funds' Entitlement to "All" Revenues Attendant to Ownership, and by Omitting His Fraudulent Insurance Premium Scheme**

46.     The Plaintiffs, and the total class, invested in the Funds, collectively paying $234,1993,309.30 to purchase membership interests in Fund 7, Fund 8, and Vero Beach Fund.

47.     The Plaintiffs' claims focus on Dahn's affirmative misrepresentations, in the Investment Documents and elsewhere, regarding the Funds' entitlement to all revenues attendant to the Funds' ownership of self-storage facilities, and Dahn's fraudulent concealment of his Insurance Premium Scheme and related self-dealing.

48.     In sum, at all relevant times, in his capacity as the Funds' co-Manager, in his capacity as the Funds' property manager, and for his own personal benefit and gain, Dahn participated in the marketing, promotion, and sale of membership interests to the Plaintiffs. Dahn did so by agreeing to co-sponsor the Funds, by identifying and soliciting potential investors (including by tapping into his extensive experience and connections in the self-storage industry), and by disseminating and agreeing to certain materials (including Offering Memoranda and Investment Documents) that included false representations about the Funds' entitlement to revenues attendant to the Funds' ownership of the underlying properties, or which fraudulently omitted Dahn's Insurance Premium Scheme. In reality, and contrary to Dahn's representations to the Plaintiffs, including through these written materials, Dahn organized an affiliated captive insurance company to sell insurance programs to, and collect monthly premiums from, tenants at the Funds' self-storage facilities. Specifically, Dahn perpetrated the scheme by organizing the captive insurance affiliate, Dahn Corporation, as property manager without knowledge or permission from Plaintiffs; insurance money was then deposited into Fund specific property accounts; tenant insurance funds were then sent to Bader Insurance Company to administer those

15

insurance products for a fee; and, after receiving the tenants' monthly premium payments, Dahn Corporation received a 25% kickback of the gross premium collected by Bader Insurance Corporation, and the remaining profit was deposited in KMD Segregated Portfolio, SPC. Dahn has never disclosed this scheme to the Plaintiffs, the other Fund investors, Fund counsel, or the independent auditors of the Funds, and, as addressed below, has actively and intentionally concealed the scheme for almost a decade. To date, through the Insurance Premium Scheme, Dahn has diverted and embezzled approximately $5.5 million that would have been due to the Funds and, thus, to the Plaintiffs as members of the Funds. This amount continues to increase daily.

49.    Below, we describe the general terms of the Plaintiffs' investments in the Funds; describe Dahn's affirmative misrepresentations in the Investment Documents and Offering Memoranda; and describe Dahn's fraudulent omissions and misstatements in the Investment Documents.

***The General Terms of the Plaintiffs' Investments in the Funds***

50.    In connection with the Plaintiffs' purchase of membership interests in the Funds, the Funds' sponsors (including Dahn) disseminated certain written materials to the Plaintiffs describing the investment opportunity, outlining the general terms of the investment, and constituting the governing terms of the Funds if an investor ultimately agreed to invest. These written materials included, among others, the Funds' Investment Documents (i.e., a Private Placement Memorandum, Operating Agreement, and Subscription Agreement for each Fund). Copies of the Investment Documents for Fund 7, Fund 8, and Vero Beach Fund are attached as **Composite Exhibits. 1, 2, and 3** respectively.[1]

---

[1] Because each Fund's Investment Documents are substantively identical, unless otherwise indicated, the citations to the Investment Documents, above, are uniform across the documents.

16

51.     Notably, as the Funds grew and developed, the Funds' sponsors (including Dahn) supplemented the Investment Documents, including by identifying additional properties that the Funds had acquired since the dissemination of the previous iteration of the Investment Documents. Dahn, however, also intentionally concealed the existence of the Insurance Premium Scheme in connection with the supplemented Investment Documents, even though the supplemented documents presented an opportunity for Dahn to disclose, and obtain informed consent regarding, his operation of a tenant insurance program.

52.     With respect to the nature of the investment, the PPM and Operating Agreement provide that each Fund is a Delaware, manager-managed limited liability company. PPM at Section 2.3; Operating Agreement at Section 7.1. The PPM further provides that the membership interests are securities (*see, e.g.*, PPM at iii–v, Section 16), and that the Fund was offering the units only to "accredited investors" through a private placement, in reliance on an exemption from registration under Regulation D, Rule 506(c), under the Securities Act of 1933. *Id.* at Section 1.2.

53.     As for the Funds' business purpose, the PPM and Operating Agreement provide that the Funds were formed to acquire, own, and operate self-storage facilities and MHCs, directly or through special purpose vehicles. PPM at Section 2.9; Operating Agreement at Section 3.1. The PPM further provides that the Manager "intends to operate the Company in such a manner as to generate distributions it can share with the Members from Net Operating Cash Flow, Net Capital Event Proceeds, and/or Refinancing Proceeds." PPM at Section 4; Operating Agreement at Section 5.

54.     To effectuate the Funds' business purpose, the PPM and Operating Agreement provide for the appointment of Dahn's affiliated entity—Defendant Dahn Corporation—to serve as the Funds' exclusive, full-time property manager under Property Management Agreements, for

which Dahn Corporation would earn fees, including a monthly Property Management Fee equal to 5% of each property's monthly gross revenues. PPM at Sections 2.10, 5.1; Operating Agreement at Section 7.17. Indeed, the PPM touted Dahn's extensive "property management experience," representing that Dahn and Dahn Corporation had "acted as the property manager to over 100 self storage facilities . . . ." PPM at Section 9.1.2. Accordingly, the Investment Documents made clear, and the Plaintiffs understood that Dahn would have extensive control over the Funds, including exclusive control over property management.

55.     Finally, with respect to removal of Dahn as a Manager, the Operating Agreement provides for removal if a Manager engages in "acts or omissions constituting fraud, gross negligence, or willful misconduct, as determined by a non-appealable judgment of a court of competent jurisdiction." Operating Agreement at Section 13.1.

56.     With the Plaintiffs' investment capital, the Funds organized special purpose vehicles to acquire and operate self-storage facilities and MHCs. Currently, the Funds (through these special purpose vehicles or directly, in the case of Vero Beach Fund) own and operate properties in several states, including Florida.

***Dahn Makes Affirmative Misrepresentations in Connection with the Investment Documents and the Offering Memoranda***

57.     At all relevant times, Dahn induced the Plaintiffs into believing, and the Investment Documents reflected, that the Funds would be entitled to all of the financial benefits attendant to the acquisition, ownership, and management of the Funds' properties.

58.     The PPM, for example, represents that "[t]he [Fund] anticipates generating distributable cash from operations and eventual sale of the Properties that it can share with its Members as Net Proceeds Available for Distribution." PPM at vii. Similarly, with respect to periodic distributions, the Operating Agreement represents that "[t]he Fund shall strive to

distribute Distributions of Net Operating Cash Flow, if any, on a monthly basis," with "Net Operating Cash Flow" defined as "***all cash revenues***, accrued interest and other funds received by the [Fund]" for any period, other than Net Capital Event Proceeds, minus Capital Contributions, cash expenses, and any other nondeductible cash items. Operating Agreement at Sections 1, 5.1(A) (emphasis added). Accordingly, based on these representations in the Investment Documents, the Plaintiffs understood that the Funds would be entitled to receive, and that the Plaintiffs would in turn enjoy, all of the financial benefits connected to the Funds' ownership of the properties, unless the Investment Documents specifically excluded any particular item of potential income from the scope of the Funds' entitlement. This entitlement included revenues from tenant insurance programs, which only the Funds (as the owners of the properties) were authorized to operate, and the revenues of which were "cash revenues" of the Funds as contemplated in the Investment Documents. Indeed, none of the Investment Documents contemplated that Dahn—especially as a fiduciary of the Plaintiffs—would be entitled to arrogate to himself the benefits of a financial opportunity that belonged exclusively to the Funds, much less in the secret manner that he did so.

59.     Likewise, the Investment Documents explicitly outlined, and limited, the fees to which the Funds' Managers, and Dahn (in his capacity as the property manager), would be entitled. In this connection, the PPM and Operating Agreement provide for the payment of only eight categories of fees to the Managers (none of which is related in any way to tenant insurance, and neither of which could conceivably cover Dahn's operation of the Insurance Premium Scheme):

- An Asset Management Fee;
- An Acquisition Fee;
- Loan Fees;
- A Property Management Fee;

19

- A Construction Management Fee;

- A Disposition Fee;

- FundAmerica Fees; and

- Selling Commissions.

PPM at Section 5.1; Operating Agreement at Section 7. This explicit listing of fees—extensive on its own—was a material consideration for the Plaintiffs during the investment process because they understood that the Funds' Managers and property manager (and, in particular, Dahn) would have extensive, if not exclusive, control over the Funds' properties and operations. It was essential to the Plaintiffs, therefore, that the Investment Documents explicitly cabin the scope and amount of fees that Dahn could extract from the Funds. Accordingly, at all relevant times, the Plaintiffs understood that this listing of fees represented an exhaustive list of the fees to which Dahn may have been entitled as the Funds' co-Manager and property manager.

60.    Dahn also made similar affirmative misrepresentations in connection with the Offering Memoranda.

61.    Specifically, as with the Investment Documents, and as part of his scheme to induce the Plaintiffs' investments in the Funds, Dahn made affirmative misrepresentations through the Offering Memoranda, falsely representing that the Funds would, as a consequence of their ownership of the properties, be entitled to collect insurance payments (including monthly premium payments) from the properties' tenants. Dahn disseminated the Offering Memoranda to several individuals, including the Smiths, in their capacities as co-Manager of the Funds and as investors in the Funds. Crucially, the Offering Memoranda (as with the Investment Documents) informed the Smiths' understanding concerning the expected income stream for the Funds, including with

20

respect to tenant insurance income, which the Smiths in turn communicated to other investors, including several of the Plaintiffs, who relied on these communications to invest in the Funds.

62.     The representations in the Offering Memoranda, as with the Investment Documents, were critical to the Plaintiffs' consideration of the investment opportunity, including their evaluation of the expected financial benefits of (and, relatedly, the potential risks of) an investment in the Funds. The Memoranda included crucial information about the property, including information about the property's location and surroundings, details about acquisition costs, and, as most relevant here, financial data regarding the income-generating potential of the property.

63.     The financial data in the Offering Memoranda included extensive information about the relevant property's financial performance, on both a historical and projected basis. With respect to self-storage facilities, each Memorandum identified and disclosed several components of the property's profitability, including information about the number of rentable storage units at (and a description other cash-flowing amenities and services at) the property; information about the property's historical and projected revenues; information about the property's historical and projected operating expenses; and, ultimately, a computation of the property's current and projected profitability. Notably, each Offering Memorandum represented that the Fund's acquisition and ownership of the subject property would entitle the Fund to charge and collect tenant insurance payments (including monthly premium payments), rendering these payments a component of the property's (and, thus, of the Fund's) income stream. These representations were consistent with those in the Investment Documents, which, as noted, represented that the Plaintiffs would be entitled to distributions based on "all cash revenues" of the Funds. The Offering Memorandum for Buffalo Storage in Las Vegas, Nevada (owned by Fund 8), for example, included

21

the following page, representing that "Tenant Insurance Income" was, and would be, a component of the property's revenue stream:

## INCOME & EXPENSES

| REVENUE | CURRENT T - 9 | $/SF | | ADJ. T - 9 | $/SF | YEAR 1 | $/SF | YEAR 2 | $/SF | YEAR 3 | $/SF |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Scheduled Base Rental | 975,060 | $14.46 | | 975,060 | $14.46 | 1,121,319 | $16.63 | 1,289,517 | $19.12 | 1,444,259 | $21.42 |
| Physical Occupancy | 96% | | | 96% | | 92% | | 92% | | 92% | |
| Economic Occupancy | 68% | | | 68% | | 75% | | 80% | | 85% | |
| **Effective Gross Rental Income** | **659,796** | | | **659,796** | | **840,989** | | **1,031,613** | | **1,227,620** | |
| Merchandise Income | 11,899 | 1.8% | | 11,899 | 1.8% | 12,615 | 1.5% | 15,474 | 1.5% | 18,414 | 1.5% |
| Cost of Goods Sold | (7,719) | | | (7,719) | | (7,821) | | (9,594) | | (11,417) | |
| Ancillary Income (e.g. Admin, Late Fees) | 19,326 | 2.9% | | 19,326 | 2.9% | 25,230 | 3.0% | 30,948 | 3.0% | 36,829 | 3.0% |
| Tenant Insurance Income | 11,280 | | | 11,280 | | 22,006 | | 33,010 | | 39,612 | |
| Truck Rental Income | 77,279 | | | 77,279 | | 77,279 | | 77,279 | | 77,279 | |
| Other Income | 44,320 | | | 44,320 | | 44,320 | | 44,320 | | 44,320 | |
| **EFFECTIVE GROSS INCOME** | **816,181** | **$12.10** | | **816,181** | **$12.10** | **1,014,618** | **$15.05** | **1,223,051** | **$18.14** | **1,432,657** | **$21.25** |
| **OPERATING EXPENSES** | | | | | | | | | | | |
| Taxes | 41,580 | $0.62 | | 41,580 | $0.62 | 42,412 | $0.63 | 43,260 | $0.64 | 44,125 | $0.65 |
| (Costs for) On-site Management | 120,779 | $1.79 | | 120,779 | $1.79 | 78,222 | $1.16 | 79,787 | $1.18 | 81,382 | $1.21 |
| Off Site Management | - | $0.00 | ▲ | 40,809 | $0.61 | 50,731 | $0.75 | 61,153 | $0.91 | 71,633 | $1.06 |
| Insurance | 12,359 | $0.18 | | 12,359 | $0.18 | 12,606 | $0.19 | 12,858 | $0.19 | 13,115 | $0.19 |
| Advertising | 450 | $0.01 | ▲ | 13,487 | $0.20 | 13,756 | $0.20 | 14,031 | $0.21 | 14,312 | $0.21 |
| Repairs and Maintenance | 31,094 | $0.46 | | 31,094 | $0.46 | 31,716 | $0.47 | 32,350 | $0.48 | 32,997 | $0.49 |
| Reserve for Capital Improvements | - | $0.00 | ▲ | 10,115 | $0.15 | 10,115 | $0.15 | 10,115 | $0.15 | 10,115 | $0.15 |
| Utilities | 30,338 | $0.45 | | 30,338 | $0.45 | 30,945 | $0.46 | 31,564 | $0.47 | 32,195 | $0.48 |
| Administration | 7,619 | $0.11 | ▲ | 13,487 | $0.20 | 13,756 | $0.20 | 14,031 | $0.21 | 14,312 | $0.21 |
| Bank Charges | 757 | $0.01 | ▲ | 14,283 | $0.21 | 17,756 | $0.26 | 21,403 | $0.32 | 25,071 | $0.37 |
| Telephone | - | $0.00 | ▲ | 6,069 | $0.09 | 6,190 | $0.09 | 6,314 | $0.09 | 6,440 | $0.10 |
| Professional Fees | 2,683 | $0.04 | ▲ | 3,500 | $0.05 | 3,570 | $0.05 | 3,641 | $0.05 | 3,714 | $0.06 |
| Other | - | $0.00 | | - | $0.00 | - | $0.00 | - | $0.00 | - | $0.00 |
| Non-Operating Expense | - | $0.00 | | - | $0.00 | - | $0.00 | - | $0.00 | - | $0.00 |
| **OPERATING EXPENSES** | **247,659** | **$3.67** | ▲ | **337,900** | **$5.01** | **311,776** | **$4.62** | **330,508** | **$4.90** | **349,413** | **$5.18** |
| *Operating Expense Ratio* | *30%* | | | *41%* | | *31%* | | *27%* | | *24%* | |
| **NET OPERATING INCOME** | **568,522** | **$8.43** | **▼** | **478,282** | **$7.09** | **702,842** | **$10.42** | **892,542** | **$13.24** | **1,083,243** | **$16.06** |

CUSHMAN & WAKEFIELD    27

64.    But Dahn's representations about the Funds' entitlement to tenant insurance payments—as communicated through the Offering Memoranda and the Investment Documents, which Dahn disseminated and adopted—were false, affirmative misrepresentations. Dahn knew that the Funds would not offer insurance programs to, or collect insurance premiums from, the tenants at the Funds' properties. Instead, as of the dates the Offering Memoranda and the Investment Documents were disseminated to Plaintiffs and other potential investors, Dahn had already organized a captive insurance company to sell insurance programs to, and collect premiums from, self-storage tenants, thus allowing Dahn to misappropriate, siphon, and embezzle

22

these payments from their proper owner: the Funds. Given the long-running nature of the Insurance Premium Scheme, the large number of properties owned by the Funds, and the vast number of tenants from whom Dahn has extracted these payments, Dahn's scheme has resulted in his unlawful receipt of approximately $5 million.

65.     In furtherance of the scheme, dating back to the initial discussions of forming Fund 7, the first of the three Funds, Dahn lied to the Smiths about tenant insurance. When Ryan Smith suggested that tenant insurance could be an additional revenue stream for Fund 7, Dahn responded that providing tenant insurance was not economically beneficial and suggested that tenant insurance be handled through a third party company called Bader Insurance Company ("Bader") for the self-storage facilities. In reality, Dahn was planning to use Bader to administrate Dahn's own captive insurance scheme for tenants of the Funds' self-storage facilities. Specifically, Dahn was receiving a 25% kickback from Bader Insurance with the balance of profits going to KMD Segregated Portfolio, SPC. Once the scheme was implemented, Dahn continued to make similar misrepresentations in order to conceal his secret operation of the captive tenant insurance scheme, and to dissuade the Smiths and other Plaintiffs from asking questions about tenant insurance which might lead to the discovery of the scheme.

***Dahn Engages in Fraudulent Omissions in Connection with the Investment Documents***

66.     At the same time that Dahn was affirmatively misrepresenting that the Funds would be entitled to operate a tenant insurance program and that the Plaintiffs would be entitled to distributions from "all cash revenues" of the Funds, Dahn was also fraudulently omitting the Insurance Premium Scheme from the Plaintiffs, including from the Investment Documents. As discussed below, the Investment Documents are misleading in numerous ways and contain

23

provisions that are fundamentally incompatible with Dahn's perpetration of the Insurance Premium Scheme and related self-dealing.

67.     ***First***, and most notably, none of the Investment Documents—neither the PPMs, the Operating Agreements, nor the Subscription Agreements—discloses the existence of the Insurance Premium Scheme. Even setting aside Dahn's affirmative misrepresentations in the Investment Documents and the Offering Memoranda, Dahn's fraudulent omission of the Insurance Premium Scheme from the Plaintiffs was material, as no Plaintiff expected (and no reasonable investor would have expected) Dahn to covertly misappropriate payments or assets that were attributable solely to the Funds' ownership of the properties, and which would have benefited the Funds.

68.     ***Second***, by serving as the Funds' co-Manager and by agreeing to the Operating Agreements, Dahn was bound by the fiduciary duties of loyalty, care, and good faith and fair dealing. In view of these fiduciary duties, Dahn's fraudulent omission of the Insurance Premium Scheme was false and misleading because, as noted, by the time that the Plaintiffs had invested in the Funds, Dahn was already flagrantly breaching these duties by secretly misappropriating, siphoning, and embezzling tenant insurance payments from the Funds.

69.     ***Third***, as noted above, the Investment Documents contemplated that the Funds (or the special purpose vehicles owned by the Funds) would enter into Property Management Agreements with Dahn Corporation to govern Dahn's day-to-day management of the properties. Although Dahn Corporation executed Property Management Agreements concerning each of the Funds' numerous properties, in these agreements, and over the course of nearly a decade, Dahn likewise fraudulently omitted that he was engaged in the Insurance Premium Scheme.

70.     ***Fourth***, as explained, the Investment Documents vest Dahn with significant control over the Funds, both as the Funds' co-Manager and as their exclusive property manager. Given the

24

documents' contemplation of Dahn's significant (and, in the case of property management matters, exclusive) control, the PPM and Operating Agreement require Dahn to avoid conflicts of interest with the Funds, including self-dealing transactions. *See* PPM at Section 7.1; Operating Agreement at Section 7.1(A)(13). Section 7.1(A)(13) of the Operating Agreement, for example, provides that the Managers may enter into related-party transactions (i.e., transactions with a member or affiliate of the Managers) if (i) the related party is qualified in the transaction, (ii) the price and terms of the transaction are fair to the Fund, and (iii) the Fund would enforce its rights under the transaction as if it were an arm's-length transaction. This provision (which, of course, cannot possibly authorize the Insurance Premium Scheme, given that Dahn has never disclosed or sought approval for this inherently unfair scheme to begin with), demonstrates that the Plaintiffs and the Funds' investors expected Dahn to avoid self-dealing in connection with his control of the Funds.

\*     \*     \*

71.     In sum, Dahn's perpetration of the Insurance Premium Scheme was a material consideration for the Plaintiffs' investments in the Funds. While already engaged in the scheme, Dahn affirmatively misrepresented that the Funds would be entitled to collect tenant insurance payments, that the Funds could generate revenues and profits from those payments, and, thus, that the Plaintiffs, as members of the Funds, could expect to receive the economic benefits of those payments, including through distributions of "all cash revenues" of the Funds, as represented in the Investment Documents—while concealing his self-dealing by also telling the Smiths that tenant insurance should be outsourced to a third-party insurer because it would not be a profitable endeavor for the Funds. Likewise, in addition to making these affirmative misrepresentations, Dahn fraudulently omitted the Insurance Premium Scheme from the Plaintiffs, siphoning payments

that were the sole and exclusive property of the Funds, while simultaneously and falsely representing that he would honor his fiduciary duties and avoid self-dealing.

## C. The Smiths Recently, and Coincidentally, Discover the Insurance Premium Scheme

72.     From the launch of the Funds through the present, Dahn has had exclusive control over the day-to-day management of the Funds' self-storage facilities and MHCs, as contemplated in the Investment Documents. And, as noted, during the course of this nearly decade-long period, Dahn has concealed the Insurance Premium Scheme from investors.

73.     Specifically, after inducing the Plaintiffs' investments in the Funds based on the misrepresentations and omissions described above, Dahn continued to conceal the Insurance Premium Scheme from the Plaintiffs, including by fraudulently concealing the existence of the scheme from periodic written updates to investors; by fraudulently omitting the scheme from Property Management Agreements, additional versions of which Dahn executes from time to time in connection with the Funds' acquisition of additional properties; by fraudulently omitting the scheme from supplemented versions of the Investment Documents; and by otherwise failing to disclose the scheme to the Plaintiffs and the Funds' investors. Given Dahn's exclusive control over the management of the Funds' properties, and given his concealment of the Insurance Premium Scheme, the Plaintiffs did not discover (and could not have reasonably discovered) Dahn's perpetration of the scheme until the events that precipitated the filing of this lawsuit.

74.     Importantly, the Plaintiffs discovered the existence of the Insurance Premium Scheme only recently and, indeed, only coincidentally.

75.     On January 9, 2025, the Smiths, in connection with their duties as co-Manager of the Funds, participated in a call with Storable, a company that provides technologies, software products, and other solutions to self-storage operators, including insurance products. Although the

26

January 9th call did not relate specifically to Dahn or the Insurance Premium Scheme (which had yet to be discovered), during the call, Storable's representative revealed that Storable (in conjunction with Bader Insurance Company) had been working with Dahn to provide insurance coverage to tenants at the Funds' self-storage facilities.

76.    On January 21, 2025, the Smiths had a follow-up call with Storable. During the January 21st call, the Smiths learned, for the first time, that Dahn had organized KMD Segregated Portfolio, SPC, an affiliated captive insurance company, to sell insurance programs to, and collect insurance premiums from, tenants at the Funds' self-storage facilities—i.e., the Insurance Premium Scheme. During this call, Storable's representative suggested that an alternative insurance structure could be more profitable for the Funds than the captive structure that Dahn had implemented.

77.    On January 22, 2025, Ryan Smith emailed Defendant David Jorgensen, Dahn Corporation's internal controller, to ask about Dahn's captive insurance affiliate, of which he had not heard until the January 21st call with Storable. Reasonably assuming that Dahn's receipt of insurance payments would be reflected in the Funds' financial records as revenue to the Funds, Mr. Smith asked Jorgensen where the tenant insurance payments "hit the [Funds'] P&L." In response, on January 27, 2025, Jorgensen stated that "the insurance premiums do not show up on the P&L" because, as he admitted: "They are collected from the tenants and promptly sent to the insurance company that provides the coverage. They are not recorded as income/expense."

78.    The "insurance company" referenced in Jorgensen's email is, of course, Dahn's captive insurance affiliate KMD Segregated Portfolio, SPC named for Dahn's children Karen, Michelle and David. Based on certain materials that the Smiths recently discovered, including a summary compilation of the insurance payments made to Dahn to date, since as early as 2017, Dahn has been engaged in the Insurance Premium Scheme, and has collected approximately $5.5

27

million in Improper Premiums. Dahn perpetrated the scheme by organizing the captive insurance affiliate, Dahn Corporation, as property manager; money was then deposited into Fund specific property accounts; insurance was then sent to  Bader Insurance Company to administer those insurance products for a fee; and, after receiving the tenants' monthly premium payments, by profiting off the difference between Dahn's administrative costs and the monthly premium payments but only after Dahn Corporation received a 25% kickback of the gross premium collected by Bader Insurance Corporation, and the remaining profit was deposited in KMD Segregated Portfolio, SPC. None of this was ever disclosed to the Smiths or the other Plaintiffs.

79.    The Insurance Premium Scheme, the Improper Premiums, and Dahn's related self-dealing have resulted in an enormous fraud on the Plaintiffs, the Funds' investors, and the Funds. Over the course of Dahn's nearly decade-long scheme, Dahn has siphoned at least *$5,586,069.84* in Improper Premiums, all of which belonged to the Funds (and, by extension, to the Plaintiffs as members of the Funds). Worse yet, Dahn's Insurance Premium Scheme has not only deprived the Funds of the value of the diverted revenues and profits—approximately $5.5 million—but has also deprived the Funds of the consequential profits therefrom, including by precluding the Funds from capitalizing on and profiting from the diverted monies, and by diminishing the Funds' net asset value for the purposes of refinancing(s) and or a potential sale of the Funds. In all of these different ways, the Insurance Premium Scheme has reduced the value of the Plaintiffs' membership interests in the Funds.

80.    After discovering the scheme, the Plaintiffs have investigated the Funds lost profits from the tenant insurance program. Had Defendants disclosed the plan for tenant insurance to the Funds, the Funds could have been optimized to generate 50% more in premiums and the Funds

28

would have been able to keep up to 85% of the premiums as profits. This could have generated more than $7,750,000 in total premiums with $6,200,000 being realized as profits by the funds.

**D. Dahn Refuses to Cooperate with Requests for Information Regarding the Scheme**

81.     On February 6, 2025, shortly after the Smiths had discovered the Insurance Premium Scheme, the Smiths' counsel contacted Dahn's counsel concerning the events alleged in this complaint.

82.     Given the secretive nature of Dahn's scheme and the Funds' need to investigate and disclose any wrongdoing or improper self-dealing to Fund investors, the Smiths requested that Dahn immediately provide an explanation for the events alleged in the complaint, including any contractual, legal, or other grounds for Dahn's perpetration of the scheme or his receipt of the Improper Premiums. The Smiths also requested that Dahn immediately produce books and records reflecting the receipt and disbursement of payments collected by Dahn related to tenant insurance.

83.     In response, on February 10, 2025, Dahn, through counsel, provided only a generic denial of wrongdoing, and refused to respond in substance to, much less assuage the serious concerns articulated in, the Smiths' February 6th email. Relatedly, since the time that the Smiths discovered the Insurance Premium Scheme, Dahn has repeatedly refused to cooperate with reasonable requests for information, including requests to identify the name of the captive insurance affiliate that Dahn used to perpetrate the scheme, or to produce books and records related to Dahn's receipt and disbursement of the Improper Premiums. The reason for Dahn's recalcitrance, of course, is that he simply has no defense for his perpetration of the scheme. Dahn has also since admitted, in connection with the arbitration between the Parties, that he created the tenant insurance scheme to "benefit me, my estate, and my children." Dahn has specifically stated

to the Plaintiffs that he executed the scheme as a way to personally profit from the investments made by Plaintiffs without disclosing or sharing the income rightfully owed to investors.

## CLASS ACTION ALLEGATIONS

84.    Plaintiffs seek to pursue their claims on behalf of a class of similarly situated persons pursuant to Florida Rule of Civil Procedure 1.220. The parameters of the class may be refined through discovery and will be subject to Court approval and modification, but for purposes of this complaint, Plaintiffs propose the following class definition:

> *All persons and/or entities who purchased membership interests in MHPI VII, LLC (Fund 7), Elevation Fund 8, LLC (Fund 8), and Elevation Vero Beach SA, LLC (Vero Beach Fund) on the basis of misleading statements made by or attributable to Defendants, KMD Investments I, LP (KMD I), KMD Investments III, LP (KMD III), KMD Investments V, LP (KMD V), Dahn Corporation, Nancy Naeve, David Jorgensen, or Brian Dahn.*

85.    Plaintiffs further propose that the following persons be excluded from any certified class: (i) Defendants and their current or former officers, directors, legal representatives, employees, parent companies, subsidiaries, predecessors, successors, or assigns; and (ii) all judicial officers and associated court staff assigned to this case and their immediate family members.

86.    The proposed class meets the requirements for class certification pursuant to Florida Rule of Civil Procedure 1.220(a) and 1.220(b)(3).

87.    *Numerosity*: The class is sufficiently numerous such that individual joinders are impracticable. $234 million+ worth of membership interests were sold to several hundred investors or more.

88.    *Commonality*: Plaintiffs' and Class Members' claims against Defendants present common questions of law and fact, including:

30

a. Whether the membership interests in the Funds were "securities" within the meaning of Florida law;

b. Whether the membership interests were offered for sale on the basis of false and/or misleading statements concerning the tenant insurance program;

c. Whether the Defendants violated their legal duties in connection with the offering of the membership interests without disclosing the tenant insurance program

d. Whether any of the Defendants provided material aid to Defendant Dahn in support of the tenant insurance scheme.

89. *Typicality*: Plaintiffs' claims are typical of the class's claims. Plaintiffs and the Class Members were all victims of the tenant insurance scheme, and each has claims against the Defendants on account of their respective roles in connection with that scheme. Each claim will depend on common proof concerning the Defendants' misconduct.

90. *Adequacy*: Plaintiffs are members of the class and will fairly and adequately protect its interests. Plaintiffs' interests are aligned with those of the class, as each seeks to recover damages from the Defendants for misrepresenting the membership interests they were offering for sale and the lost monetary value taken by Defendants via the tenant insurance scheme.

91. *Predominance*: The common questions identified above are likely to predominate at trial when compared to any individualized issues that may arise. The major issues upon which Defendants' liability depends are each susceptible to generalized proof that would establish liability as to all class members through a single trial.

92. *Superiority*: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Successfully prosecuting class members' claims is likely to require intensive discovery of a multi-million dollar financial institution, review of large

31

amounts of electronically stored information, and hiring of regulatory and financial experts to explain and interpret the significance of both Defendants' misconduct. These matters are best handled through unified class-wide representation, which can be conducted on a contingency fee basis and offers class members economies of scale unavailable in individual proceedings. A class action also has the benefit of comprehensive supervision by a single court and will avoid the risk of inconsistent results.

93.     In the alternative, the Class may be also certified because the prosecution of separate actions by individual investors would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendants; and/or the prosecution of separate actions by individual investors would substantially impair or impede their ability to protect their interests.

94.     Adequate notice can be given to Class members directly using information maintained in Defendants' records and/or through notice by publication.

95.     Compensatory damages may be calculated, in part, from the information maintained in Defendants' records, as well as the records of members of the Class, so that the cost of administering a recovery for the Class can be minimized. However, the precise amount of damages available to Plaintiffs and the other members of the Class is not a barrier to class certification.

## CLAIMS FOR RELIEF

### COUNT I
**Securities Fraud, in Violation of the California Corporation Code §25401 et seq.**
**(By the Plaintiffs Against All Defendants)**

96.     The Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 81 of the complaint, as if those allegations appeared in this count.

97. This is a claim for securities fraud, in violation of the anti-fraud provisions of the California Corporations Code §25401 et seq.

98. California Corporations Code §25401 provides, in relevant part, that it is unlawful for a person "to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading."

99. Defendant Brian Dahn—and, through Dahn, Defendants KMD I, KMD III, KMD V, and Dahn Corporation, as well as its control persons Naeve and Jorgensen—violated California Corporations Code §25401 and are liable under the Code's civil liability provisions, including §§ 25501, 25504 and 25504.1.

100. In connection with the marketing, promotion, and sale of membership interests in the Funds, the Defendants made and/or controlled the making of material misrepresentations and omissions to the Plaintiffs while based in and disseminated from California. As described and alleged more fully above, the Defendants made and/or controlled the making of affirmative misrepresentations to the Plaintiffs, falsely stating, through the Offering Memoranda and in other pre-investment communications, that the Funds would be entitled to (and, thus, that the Funds and its members would have an economic interest in) insurance payments from tenants at the Funds' self-storage facilities. Dahn also affirmatively misrepresented, through the Investment Documents and in other pre-investment communications, that the Plaintiffs would be entitled to receive distributions from "all cash revenues" of the Funds, which included tenant insurance revenues. The Defendants also affirmatively misrepresented that the listing of fees in the Investment Documents represented an exhaustive list of fees to which the Defendants may have been entitled

in connection with their roles as co-Manager and property manager for the Funds. Likewise, in the Investment Documents and in other communications with the Plaintiffs, the Defendants fraudulently omitted the existence of the Insurance Premium Scheme, while simultaneously and falsely representing to the Plaintiffs that they would undertake fiduciary duties and avoid self-dealing transactions.

101.    Dahn also made affirmative misrepresentations to the Smiths about the unprofitability of administering a tenant insurance program to dissuade anyone from looking further into the subject and thereby potentially discovering his fraud and self-dealing.

102.    The Defendants made the misrepresentations and omissions to the Plaintiffs to induce the Plaintiffs' investments in the Funds. The Defendants' misrepresentations were knowingly false because, at the time of the misrepresentations, the Defendants knew that Dahn was perpetrating the Insurance Premium Scheme and, thus, that the Funds would not be entitled to the purported insurance payments, or to "all" revenues attendant to the Funds' ownership of the properties. Likewise, the Defendants knew and understood that their representations in, and the duties arising from, the Investment Documents were false and illusory. At a minimum, the Defendants were severely reckless as to the truth or falsity of the misrepresentations and omissions to the Plaintiffs.

103.    The Plaintiffs justifiably relied on the misrepresentations and omissions in purchasing membership interests in the Funds. The Defendants' misrepresentations and omissions were also the cause—both the "but for" cause and proximate cause—of the Plaintiffs' injuries.

**Wherefore**, as to Count I of the Complaint, the Plaintiffs respectfully request that the Court enter a judgment in their favor, and against the Defendants, and that the Court award the Plaintiffs equitable rescission of their investments in the Funds; compensatory damages (including out-of-

34

pocket damages and consequential damages); injunctive relief to stop the Defendants' violations of the California Corporations Code §25401; pre-judgment interest; and any other relief that the Court considers proper.

**COUNT II**
**Securities Fraud, in Violation of Florida's Blue Sky Law**
**§ 517.301, Fla. Stat.**
**(By the Plaintiffs Against All Defendants)**

104. The Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 89 of the complaint, as if those allegations appeared in this count.

105. This is a claim for securities fraud, in violation of Florida's Blue Sky Law, § 517.301, Fla. Stat.

106. Section 517.301(1)(a) provides, in relevant part, that it is unlawful for a person, in connection the offer, purchase, or sale of any security, "(a) To employ any device, scheme, or artifice to defraud, (b) To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person." Fla. Stat. § 517.301(1)(a).

107. Defendant Brian Dahn—and, through Dahn, Defendants KMD I, KMD III, KMD V, and Dahn Corporation, as well as its control persons Naeve and Jorgensen—violated § 517.301's Anti-Fraud Provisions and its provisions for control person liability under § 517.211.

108. In connection with the marketing, promotion, and sale of membership interests in the Funds, the Defendants made material misrepresentations and omissions to the Plaintiffs. As described and alleged more fully above, the Defendants made affirmative misrepresentations to the Plaintiffs, falsely stating, through the Offering Memoranda and in other pre-investment

35

communications, that the Funds would be entitled to (and, thus, that the Funds and its members would have an economic interest in) insurance payments from tenants at the Funds' self-storage facilities. Dahn also affirmatively misrepresented, through the Investment Documents and in other pre-investment communications, that the Plaintiffs would be entitled to receive distributions from "all cash revenues" of the Funds, which included tenant insurance revenues. The Defendants also affirmatively misrepresented that the listing of fees in the Investment Documents represented an exhaustive list of fees to which the Defendants may have been entitled in connection with their roles as co-Manager and property manager for the Funds. Likewise, in the Investment Documents and in other communications with the Plaintiffs, the Defendants fraudulently omitted the existence of the Insurance Premium Scheme, while simultaneously and falsely representing to the Plaintiffs that they would undertake fiduciary duties and avoid self-dealing transactions.

109. Dahn also made affirmative misrepresentations to the Smiths about the unprofitability of administering a tenant insurance program to dissuade anyone from looking further into the subject and thereby potentially discovering his fraud and self-dealing.

110. The Defendants made the misrepresentations and omissions to the Plaintiffs with scienter, and to induce the Plaintiffs' investments in the Funds. The Defendants' misrepresentations were knowingly false because, at the time of the misrepresentations, the Defendants knew that Dahn was perpetrating the Insurance Premium Scheme and, thus, that the Funds would not be entitled to the purported insurance payments, or to "all" revenues attendant to the Funds' ownership of the properties. Likewise, the Defendants knew and understood that their representations in, and the duties arising from, the Investment Documents were false and illusory. Alternatively, the Defendants were severely reckless as to the truth or falsity of the

36

misrepresentations and omissions to the Plaintiffs. At a minimum, the Defendants were negligent as to the truth or falsity of the misrepresentations and omissions to the Plaintiffs.

111.    The Plaintiffs justifiably relied on the misrepresentations and omissions in purchasing membership interests in the Funds.

**Wherefore**, as to Count II of the Complaint, the Plaintiffs respectfully request that the Court enter a judgment in their favor, and against the Defendants, and that the Court award the Plaintiffs equitable rescission of their investments in the Funds; compensatory damages (including statutory damages and consequential damages); injunctive relief to stop the Defendants' violations of § 517.301's Anti-Fraud Provisions; attorney's fees, as provided under § 517.211(7), Fla. Stat.; pre-judgment interest; and any other relief that the Court considers proper.

**COUNT III**
**Common Law Fraudulent Inducement**
**(By the Plaintiffs Against All Defendants)**

112.    The Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 97 of the complaint, as if those allegations appeared in this count.

113.    This is a claim for common law fraudulent inducement under Florida law.

114.    Defendant Brian Dahn—and, through Dahn, Defendants KMD I, KMD III, KMD V, and Dahn Corporation, as well as its control persons Nancy Naeve and David Jorgensen—fraudulently induced the Plaintiffs to invest in the Funds.

115.    In connection with the marketing, promotion, and sale of membership interests in the Funds, the Defendants made material misrepresentations and omissions to the Plaintiffs. As described and alleged more fully above, the Defendants made affirmative misrepresentations to the Plaintiffs, falsely stating, through the Offering Memoranda and in other pre-investment communications, that the Funds would be entitled to (and, thus, that the Funds and its members

would have an economic interest in) insurance payments from tenants at the Funds' self-storage facilities. Dahn also affirmatively misrepresented, through the Investment Documents and in other pre-investment communications, that the Plaintiffs would be entitled to receive distributions from "all cash revenues" of the Funds, which included tenant insurance revenues. The Defendants also affirmatively misrepresented that the listing of fees in the Investment Documents represented an exhaustive list of fees to which the Defendants may have been entitled in connection with their roles as co-Manager and property manager for the Funds. Likewise, in the Investment Documents and in other communications with the Plaintiffs, the Defendants fraudulently omitted the existence of the Insurance Premium Scheme, while simultaneously and falsely representing to the Plaintiffs that they would undertake fiduciary duties and avoid self-dealing transactions.

116.    Dahn also made affirmative misrepresentations to the Smiths about the unprofitability of administering a tenant insurance program to dissuade anyone from looking further into the subject and thereby potentially discovering his fraud and self-dealing.

117.    The Defendants made the misrepresentations and omissions to the Plaintiffs to induce the Plaintiffs' investments in the Funds. The Defendants' misrepresentations were knowingly false because, at the time of the misrepresentations, the Defendants knew that Dahn was perpetrating the Insurance Premium Scheme and, thus, that the Funds would not be entitled to the purported insurance payments, or to "all" revenues attendant to the Funds' ownership of the properties. Likewise, the Defendants knew and understood that their representations in, and the duties arising from, the Investment Documents were false and illusory. Alternatively, the Defendants were severely reckless as to the truth or falsity of the misrepresentations and omissions to the Plaintiffs.

118. The Plaintiffs relied on the misrepresentations and omissions in purchasing membership interests in the Funds and suffered injuries as a result of the misrepresentations.

**Wherefore**, as to Count III of the Complaint, the Plaintiffs respectfully request that the Court enter a judgment in their favor, and against the Defendants, and that the Court award the Plaintiffs equitable rescission of their investments in the Funds; compensatory damages (including out-of-pocket damages and consequential damages); injunctive relief to stop the Defendants' ongoing fraud; punitive damages; and any other relief that the Court considers proper.

### COUNT IV
**Common Law Negligent Misrepresentation**
**(By the Plaintiffs Against All Defendants)**

119. The Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 104 of the complaint, as if those allegations appeared in this count.

120. This is a claim for common law negligent misrepresentation under Florida law.

121. Defendant Brian Dahn—and, through Dahn, Defendants KMD I, KMD III, KMD V, and Dahn Corporation as well as its control persons Nancy Naeve and David Jorgensen—fraudulently induced the Plaintiffs to invest in the Funds and, at a minimum, made negligent misrepresentations in connection with the Plaintiffs' investments.

122. In connection with the marketing, promotion, and sale of membership interests in the Funds, the Defendants made material misrepresentations and omissions to the Plaintiffs. As described and alleged more fully above, the Defendants made affirmative misrepresentations to the Plaintiffs, falsely stating, through the Offering Memoranda and in other pre-investment communications, that the Funds would be entitled to (and, thus, that the Funds and its members would have an economic interest in) insurance payments from tenants at the Funds' self-storage facilities. Dahn also affirmatively misrepresented, through the Investment Documents and in other

pre-investment communications, that the Plaintiffs would be entitled to receive distributions from "all cash revenues" of the Funds, which included tenant insurance revenues. The Defendants also affirmatively misrepresented that the listing of fees in the Investment Documents represented an exhaustive list of fees to which the Defendants may have been entitled in connection with their roles as co-Manager and property manager for the Funds. Likewise, in the Investment Documents and in other communications with the Plaintiffs, the Defendants fraudulently omitted the existence of the Insurance Premium Scheme, while simultaneously and falsely representing to the Plaintiffs that they would undertake fiduciary duties and avoid self-dealing transactions.

123.    Dahn also made affirmative misrepresentations to the Smiths about the unprofitability of administering a tenant insurance program to dissuade anyone from looking further into the subject and thereby potentially discovering his fraud and self-dealing.

124.    The Defendants made the misrepresentations and omissions to the Plaintiffs to induce the Plaintiffs' investments in the Funds. The Defendants' misrepresentations were knowingly false because, at the time of the misrepresentations, the Defendants knew that Dahn was perpetrating the Insurance Premium Scheme and, thus, that the Funds would not be entitled to the purported insurance payments, or to "all" revenues attendant to the Funds' ownership of the properties. Likewise, the Defendants knew and understood that their representations in, and the duties arising from, the Investment Documents were false and illusory. Alternatively, the Defendants were severely reckless as to the truth or falsity of the misrepresentations and omissions to the Plaintiffs. At a minimum, the Defendants were negligent as to the truth or falsity of the misrepresentations and omissions to the Plaintiffs.

125.    The Plaintiffs justifiably relied on the misrepresentations and omissions in purchasing membership interests in the Funds and suffered injuries as a result of the misrepresentations.

**Wherefore**, as to Count IV of the Complaint, the Plaintiffs respectfully request that the Court enter a judgment in their favor, and against the Defendants, and that the Court award the Plaintiffs equitable rescission of their investments in the Funds; compensatory damages (including out-of-pocket damages and consequential damages); injunctive relief to stop the Defendants' ongoing fraud; punitive damages; and any other relief that the Court considers proper.

**<u>COUNT V</u>**
**Breach of Contract**
**(By the Plaintiffs Against All Defendants except Naeve and Jorgensen)**

126.    The Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 111 `of the complaint, as if those allegations appeared in this count.

127.    This is a claim for breach of contract, for violation of the Funds' Investment Documents, to which the Plaintiffs agreed in connection with their purchase of membership interests in the Funds.

128.    Defendant Brian Dahn—and, through Dahn and as a result of the Funds' corporate structure, Defendants KMD I, KMD III, KMD V, and Dahn Corporation—agreed to the Funds' Investment Documents.

129.    In those Investment Documents, and as a result of Dahn's service as co-Manager of the Funds, the Defendants agreed, among other things, that they would be bound by the fiduciary duties of loyalty, care, and good faith and fair dealing, that they would avoid conflicts of interest with the Funds, and that they would avoid self-dealing transactions. The Defendants' representations and undertakings in connection with the Investment Documents were false and

illusory when made because, when they entered into the agreements, the Defendants knew that Dahn was already perpetrating the Insurance Premium Scheme, that he was flagrantly breaching his fiduciary duties, and that he was engaging in the very self-dealing that the documents prohibited. Accordingly, based on this conduct, the Defendants materially breached the Investment Documents, causing the Plaintiffs to suffer damages.

**Wherefore**, as to Count V of the Complaint, the Plaintiffs respectfully request that the Court enter a judgment in their favor, and against the Defendants, and that the Court award the Plaintiffs compensatory damages (including consequential damages); injunctive relief to stop the Defendants' ongoing fraud; and any other relief that the Court considers proper.

## COUNT VI
### Declaratory Judgment for Removal of Defendants as Co-Manager of the Funds
### (Against All Defendants except Naeve and Jorgensen)

130.    The Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 115 of the complaint, as if those allegations appeared in this count.

131.    This is a claim for a declaratory judgment under the Florida Declaratory Judgment Act, § 86.011, Fla. Stat., et seq., seeking a judgment removing the Defendants as co-Manager of the Funds.

132.    As noted, in connection with their purchase of membership interests in the Funds, the Plaintiffs agreed to the Investment Documents, including the Operating Agreements.

133.    Defendant Brian Dahn—and, through Dahn and as a result of the Funds' corporate structure, Defendants KMD I, KMD III, KMD V, and Dahn Corporation—agreed to the Funds' Investment Documents, including the Operating Agreements.

134.    Section 13.1 of the Operating Agreement provides for removal if a Manager engages in "acts or omissions constituting fraud, gross negligence, or willful misconduct, as

42

determined by a non-appealable judgment of a court of competent jurisdiction." Based on the acts, omissions, and misrepresentations described above, the Defendants, in their capacities as co-Manager of the Funds, have engaged in fraud, gross negligence, or willful misconduct, subjecting them to removal under Section 13.1 of the Operating Agreement.

135.    The parties have a bona fide, adverse interest with respect to, and a substantial controversy regarding, the application of the removal provisions of the Operating Agreements; there is a live, active controversy with respect to the application of those provisions; and the Plaintiffs are entitled to the removal of any doubts concerning the application of the provisions. The Plaintiffs are, therefore, entitled to a declaratory judgment.

**Wherefore**, as to Count VI of the Complaint, the Plaintiffs respectfully request that the Court enter a judgment in their favor, and against the Defendants, providing for the removal of the Defendants as the Funds' co-Manager; providing injunctive relief to stop the Defendants' ongoing fraud; and providing any other relief that the Court considers proper.

<u>**JURY TRIAL DEMAND**</u>

Under Florida Rule of Civil Procedure 1.430, the Plaintiffs demand a jury trial on all claims or issues triable by a jury.

Dated: January 20<u>th</u>, 2026

BYRD CAMPBELL, P.A.

<u>/s/ *Robert L. Case*</u>
Robert L. Case, Esquire
Florida Bar No.: 0152129
E-mail: rcase@byrdcampbell.com
180 N. Park Avenue, Suite 2A
Winter Park, Florida 32789
Telephone: (407) 392-2285
*Counsel for Plaintiffs*

43

PFEIFFER WOLF CARR KANE
CONWAY & WISE LLP

Daniel Centner, Esquire
(will seek admission *pro hac vice*)
Email: dcentner@peifferwolf.com
935 Gravier St., Suite 1600
New Orleans, LA 70112
Telephone: (504) 523-2434

AND

Carson Kern, Esquire
Florida Bar No.: 1007986
E-mail: ckern@peifferwolf.com
935 Gravier St., Suite 1600
New Orleans, LA 70112
Telephone: (504) 523-2434
*Counsel for Plaintiffs*